UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Filippo Leone, *et al.*,

    Plaintiffs,

v.                                                       Case No. 15-11542

BMI Refractory Services, Incorporated,     Sean F. Cox
                                                                 United States District Court Judge

    Defendant.
_____/

**OPINION & ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff and his wife brought this action against Defendant, asserting negligence and loss of consortium claims under Michigan law. Defendant is a contractor that was hired to perform work inside a degasser vessel at a steel plant owned by non-party AK Steel. Plaintiff, an employee of AK Steel, was injured while working inside that same vessel 21 days after the Defendant contractor finished its work, when a piece of slag fell on him. Plaintiff claims that the Defendant contractor was negligent for failing to remove slag from the interior of the vessel when it performed its earlier work. The matter is currently before the Court on Defendant's Motion for Summary Judgment. The motion was fully briefed by the parties and the Court heard oral argument on May 4, 2017. As explained below, the Court concludes that Defendant is entitled to summary judgment as to the negligence claim because Defendant owed Plaintiff no duty under Michigan law. In addition, because the loss of consortium claim is derivative of the negligence claim, Defendant is also entitled to summary judgment as to that claim. Accordingly,

1

the Court shall GRANT summary judgment in favor of Defendant as to both counts.[1]

## BACKGROUND

Plaintiffs Filippo Leone and Anna Leone filed this action against Defendant BMI Refractory Services, Inc. ("BMI") on April 28, 2015, based upon diversity jurisdiction. Plaintiffs' Complaint alleges the following facts:

> 5. At a time presently unknown to the Plaintiffs, but known to the Defendant, the Defendant entered into a contract with A.K. Steel to provide maintenance services to A.K. Steel.
>
> 6. At a time prior to October 7, 2014, employees of the Defendant BMI undertook to remove the working lining brick and slag from a degassing vessel ("Subject Vessel") located at A.K. Steel's Dearborn operations at the former Severstal Rouge Steel Plant, also formerly known as Ford Motor Company Rouge Steel.
>
> 7. On or about October 7, 2014 Plaintiff Filippo Leone, a employee of A.K. Steel, was installing new working layer brick in the Subject Vessel, when a piece of slag, castable, or debris broke loose from the wall lining material in the area at which the alloy chute connects to the body of the Subject Vessel.
>
> 8. The slag fell and struck Plaintiff on the back, causing serious back and knee injuries.

(Compl. at 2). Plaintiffs' Complaint asserts two counts: 1) a negligence claim against BMI based upon Filippo's injury; and 2) a loss of consortium claim on behalf of Anna.

On July 16, 2015, this Court issued the original Scheduling Order (D.E. No. 11) in this matter, providing that discovery was to close on May 16, 2015. But the Court allowed the parties to extend the dates several times.

On August 24, 2015, Defendant filed a Notice of Non-Party Fault (D.E. No. 12) stating

---

[1] Defendant recently filed a motion seeking to compel an updated IME. Given the Court's ruling on Defendant's Motion for Summary Judgment, that motion is now moot.

that BMI "hereby gives notice pursuant to MCR 2.112(K)(2), MCL 600.2957 and MCL 600.6304 of its intent to seek an allocation of fault against" "Plaintiff's employer, AK Steel Corporation."

On December 22, 2016, Defendant timely filed a Motion for Summary Judgment. The motion has been fully briefed, including supplemental briefs that the Court allowed.

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Docket Entry No. 30 at 2-3).

In compliance with this Court's guidelines, in support of its Motion for Summary Judgment, Defendant BMI filed a "Statement of Material Facts Not In Dispute" (D.E. No. 29) ("Defs.' Stmt."). In response to that submission, Plaintiffs filed a "Counter-Statement of Disputed Facts" (D.E. No. 33 at Pg ID 342-45) (Pl.'s Stmt."), wherein Plaintiffs responded to the statements of fact asserted by BMI. Plaintiffs did not include an additional section containing

additional facts with citations to record evidence, or a section containing material facts as to which they contend there is a genuine issue for trial.

The following material facts are gleaned from the evidence submitted by the parties, viewed in the light most favorable to Plaintiffs, the non-moving party.

This lawsuit asserts a negligence claim based on injuries sustained while Filippo was working for AK Steel on or about October 7, 2014, due to Defendant BMI's alleged negligence. (Def.'s & Pls.' Stmts. at ¶ 1).

Plaintiffs' brief contains a helpful overview of how work is performed at steel plants, and a description of how a degasser functions. At the hearing, the Court confirmed with counsel that process was accurately described.

AK Steel manufactures a variety of steel products. Much of the masonry work performed at a steel plant is performed in a vessel used for handling steel or other refractory metals. This means that the work is performed inside of steel ladles, degassers, and other similar vessels designed for handling high temperature molten metals, which require temperature resistant refractory materials. (Pls.' Br. at 2).

A degassing vessel is a large cylinder used to hold molten steel. A schematic of the degassing vessel at issue here is attached at D.E. No. 33-7 at Pg ID 494. "It has several layers of refractory brick that form the walls and floor; there are two cavities in the bottom called snorkels, and an alloy chute on top that is used to pour molten steel into the vessel. Because of its shape, the mouth of the alloy chute (where the tube meets the large vessel) is made of a castable material that is poured into a mold." (Pls.'s Br. at 3). "Slag" is a term used to refer to the build up of scrap metal and concrete that accumulates on the face of these vessels with

repeated usage. (Pls.' Br. at 4; Pl.'s Dep. at 170).

BMI regularly performed work at AK Steel, including the tear out and rebuilding of refractory brick in AK Steel degasser vessels. (Def.'s Stmt. at ¶ 2; Pls.' Stmt. at ¶ 2).

The invoice for the work states that the work was performed on September 16, 2014 and describes the work as "Tear out face brick at Degasser Vessel." (D.E. No. 33-7 at Pg ID 502). The purchase order for this work provides no details regarding the work to be performed. (Def.'s Stmt. at ¶ 2; Pls.' Stmt. at ¶ 2; Def.'s Ex. 2). It is undisputed that there are no written AK Steel procedures or guidelines to be followed for the degasser brick tear outs. (Def.'s & Pls.' Stmts. at ¶ 3).

On September 16, 2014, a four-man BMI crew conducted the tear out of the degasser vessel face refractory brick pursuant to the verbal instructions of AK Steel Refractory Supervisor James Boggs ("Boggs"). (Def.'s & Pls.' Stmts. at ¶ 3). Construing the evidence in the light most favorable to Plaintiffs, AK Steel instructed BMI to: 1) leave the alloy cute in place; 2) tear out the brick face; and 3) tear out the hot face of the alloy chute. (Boggs Dep. at 14-15 & 18-21). The work performed by BMI at AK Steel was performed on a single day, September 16, 2014. A BMI crew of four men worked on the project: Harold Jackson, Dustin Sinclair, Chris Martin, and Oscar Lopez. (Jackson Dep. at 10). Lopez was acting as the confined space attendant on this job. (Jackson Dep. at 10). Jackson and Martin went into the degasser and did the tear out. (Jackson Dep. at 10).

It is undisputed that BMI performed the tear out of the degasser face brick "from top to bottom and that BMI personnel checked the face brick during the tear out for loose slag 'so as not to endanger BMI or other workers.'" (Pls.' Stmt. at ¶ 4). Jackson testified that "[w]hen you

first go inside, you've got to make sure there's nothing overhead that's going to fall on you and hurt you." (Jackson Dep. at 10).

During his deposition, Jackson described the general process of how the interior of a degasser is typically inspected by BMI before the BMI crew begins the tearing out of the bricks. After setting up lights to illuminate the interior of the degasser, it is visually inspected. (*Id*. at 14). "Once everything is lit and ready, we go in there and check, go from top to bottom, to check to make sure there's nothing loose overhead and make sure nothing's going to fall on us." (*Id*.). Jackson testified that when they do see loose pieces they knock them off so that they fall to the bottom. (*Id*. at 22). Jackson further testified:

> Q. Okay. And then the next thing is you check it top to bottom, what do you do when you're checking it top to bottom?
> A. You're checking to make sure there's no loose brick, no loose slag, to make sure there's nothing loose that could fall on you.
> Q. Take me through mechanically the actual physical process of doing that, what are you doing?
> A. You get close to the brick, you can grab it or you poke it with a bar or something.
> Q. You use – how do you get in there, you use a ladder?
> A. You, you have to use a ladder to get in.
> Q. So does one person do it, does the whole crew do it?
> A. One person goes in and checks it and makes sure everything is good.
> Q. Do you know between you and Chris whether it was him or you did it?
> A. I was the one that checked, checked everything.
> Q. And how do you know that?
> A. Checking it?
> Q. Yeah, how do you know it was you rather than Chris?
> A. Because I remember that date. I am the one that checked it, usually I will go in and check anything before anybody goes in.
> Q. Okay. So when you say usually you're the person who checks, do you mean on any job, on just degaser tearouts or what do you mean?
> A. Usually on jobs if I'm the boss on the job, I go check first and make sure because if somebody is going to get hurt, it's going to be me before somebody else.
> Q. So if you're the – you know you were the boss --
> A. Yes.

| | Q. | – you're running the crew? |
|---|---|---|
| | A. | Yes. |
| | Q. | Okay. So that means you would be the one who did the checks -- |
| | A. | Yes. |
| | Q. | – at the beginning? |
| | A. | Yes. |
| | Q. | All right. You also said you remember that day? |
| | A. | Yes. |
| | Q. | Do you have a picture in your mind's eye of actually going down into the vessel and checking the – checking for slag and all that? |
| | A. | Yes. |

(Jackson Dep. at 15–17).

Jackson testified that they were "doing just the hot face," from top to bottom, and that "the alloy chute is not touched unless something is loose." (*Id.* at 18). He testified that he looked at the alloy chute, including the face of the alloy chute, on his way down but did not see anything. (*Id.* at 22 & 29-30). If he had seen something, he testified that he would have knocked it off. (*Id.* at 22).

Plaintiffs dispute that Jackson ever conducted an initial inspection from a ladder prior to doing the tearout. In support of that denial, Plaintiffs rely on: 1) the confined space sign-in sheet for the day in question, that does not show Jackson having signed in first without Martin (Pls.' Ex. 3); and 2) deposition testimony from Martin (Martin Dep. at 8-9) that they generally look for loose things that could fall on them and "you eyeball it" (ie., make a visual inspection). (*See* Pls.' Stmt. at ¶ 4).

After BMI completed its work, Boggs inspected and signed off on the work performed by BMI and Boggs did not see any loose slag. (Def.'s & Pls.' Stmts. at ¶ 5).

Filippo, "a veteran mason his entire life (born 1959) had been working with AK Steel (or its predecessor Severstal) since 1997 and was also a working leader from 2010 up through the

7

day of this accident." (Def.'s & Pls.' Stmts. at ¶ 6). Filippo was "supervised by AK Steel Refractory Supervisor James Boggs." (*Id.*). Filippo "has been working in this degasser every month and half for 18 years, performing both tear out and re-bricking of the degasser face bricks. AK Steel usually did both unless they were short on manpower, then Mr. Boggs would hire BMI." (*Id.*). Filippo "had no complaints regarding BMI degasser work and did not know of anyone who did." (*Id.*).

On October 7, 2014 – 21 days after BMI completed its job – Filippo "and his crew were relining the degasser brick and had been doing so for about one week." (Def.'s & Pls.' Stmts. at ¶ 7). "For several days to a week prior, AK Steel personnel would torch off and reweld on new snorkels to the bottom of the degasser vessel." (*Id.*).

Filippo "climbed up and down the ladder which he or his crew placed inside the degasser, from top to bottom, at least 5 times per day during the week he had worked on this degasser brick relining project and had climbed up and down the same ladder at least four times the day of this accident." (Def.'s & Pls.' Stmts. at ¶ 8). "The alloy chute in this degasser is within six feet of Plaintiff or any other individual going up and down the ladder." (*Id.*). "At no time did Plaintiff see any loose slag associated with the alloy chute or its face, or anything Plaintiff thought was a danger or concern, nor did anyone on his crew during any of the dozens of trips up and down this ladder prior to Plaintiff's accident." (*Id.*). Plaintiff testified that if he "had seen such or had his crew reported such, Plaintiff would have stopped this job and remedied the condition." (*Id.*).

Part of Filippo's job as a working leader was to make sure the job he and his crew were performing was safe and be on the lookout for anything that may fall from above. (Def.'s &

Pls.' Stmts. at ¶ 11).

Filippo was working on a scaffold in the bottom of the AK Steel degasser in the course of his employment on October 7, 2014, when a piece of slag fell down and struck Filippo's lower back/buttocks. (Def.'s & Pls.' Stmts. at ¶ 13).

Although Plaintiff believes the slag that fell on him came from the face of the alloy chute (Pl. Dep. at 171-72), Plaintiff testified that he has no reason to believe that slag was loose when BMI concluded its work in the degasser:

> Q. Okay. As far as the piece of slag we've been talking about and your thought that it came from the top left corner of the face of the alloy sheet, do you have any knowledge or reason to believe that the piece of slag was loose as of the last time BMI personnel were out there tearing off the face brick?
> A. No.
> Q. Okay. Has anybody ever expressed an opinion to you that the piece of slag was loose in any fashion as of the last time BMI personnel were out at this degasser tearing off the face brick?
> A. No.

(Pl.'s Dep. at 175). Boggs, who testified that he has never heard of an incident like this having occurred before, also has no reason to believe that any material on the face of the alloy chute was loose when BMI completed its tear out work. (Boggs Dep. at 68-69).

Boggs, AK Steel's Refractory Supervisor who inspected BMI's completed work in the degasser on September 16, 2014, did not believe that BMI did anything wrong. (Def.'s & Pls.' Stmts. at ¶ 14).

The parties agree that numerous things could have caused the slag to fall off the face of the vessel, including: items being lowered into the vessel daily by crane including ladders, tools, iron scaffolding, and pallets of brick; vibration from work on or within the degasser including torching off and rewelding on the snorkels, use of pneumatic hammers/chippers; overhead crane

9

use/movement in the area of the degasser; and other vibrational forces from within the AK Steel mill. (Def.'s & Pls.' Stmts. at ¶ 10).

## STANDARD OF DECISION

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002). "The court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). "This is so because the nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial." *Id.*

## ANALYSIS

**I.  Negligence Count**

As the parties recognize in their briefs, the substantive law of Michigan governs this action that is in federal court based upon diversity jurisdiction. *See, e.g., United States v.*

*Anderson County, Tenn.,* 761 F.2d 1169, 1173 (6th Cir. 1985).

"The elements of negligence under Michigan law are duty, breach of that duty, causation, and damages." *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 357 (6th Cir. 2014). In seeking summary judgment as to the negligence count, BMI asserts that: 1) BMI did not owe a duty to Filippo Leone; 2) assuming *arguendo* that a duty was owed, Filippo cannot establish that BMI breached such a duty; and 3) Filippo also cannot establish proximate cause.

### A. Did BMI Owe A Duty To Filippo?

It is "axiomatic" that there can be no tort liability unless a defendant owes a duty to the plaintiff. *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 660 (2012).

"The threshold question of whether the defendant owed a duty to the plaintiff is question of law to be decided by the court." *SFS Check, LLC*, 774 F.3d at 357 (citing *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460 (2004)). As the Sixth Circuit has explained:

> Under Michigan law, a claim of negligence has four elements: duty, breach, damages, and causation, *Hill v. Sears, Roebuck 7 Co.*, 492 Mich. 651, 822 N.W.2d 190, 195-96 (2012), and summary judgment is appropriate where a defendant can show that he owed no duty to plaintiff. *Smith v. Kowalski*, 223 Mich.app. 610, 567 N.W.2d 463, 465 (1997). "A legal duty or obligation may arise by contract, statute, constitution, or common law." *W. Am. Ins. Co. v. Meridian Mutual Ins. Co.*, 230 Mich.App. 305, 583 N.W.2d 548, 551 (1998). While Michigan case law makes it clear that one can owe a third party a duty of care, *see Hill,* 822 N.W.2d at 207, a defendant is only liable in tort for failing to perform under a contract when there is a violation of a duty "separate and distinct from the contractual obligation." *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 683 N.W.2d 587, 592 (2004).

*Tompkins v. Crown Corr., Inc.*, 726 F.3d 830, 839-40 (6th Cir. 2013).

In seeking summary judgment, BMI asserts that in the absence of the contract between BMI and AK Steel, "BMI would not have any legal duty to remove or secure the slag or warn of any alleged hazards associated with the slag. Thus, under *Fultz* and *Loweke*, Plaintiff cannot

11

establish a legal duty." (D.E. No. 28 at Pg ID 135).

Plaintiffs agree that this issue is governed by *Fultz* and *Loweke*,[2] but assert that BMI owed a duty to Filippo under those cases.

In *Fultz*, the Michigan Supreme Court considered whether a snow-removal contractor owed a duty to a person who slipped and fell in a parking lot. The plaintiff had no relationship with the contractor, but the contractor had a contractual obligation with the owner of the parking lot to remove snow. The Michigan Court of Appeals affirmed the jury's verdict that the contractor had a common law duty to Fultz, the plaintiff who fell, to provide snow removal service in a reasonable manner, and had breached that duty by failing to remove the snow.

The Michigan Supreme Court reversed, holding that the contractor owed no duty to the plaintiff who slipped and fell. The court noted that in cases involving negligence claims based on a defendant's contractual obligations, Michigan courts had "drawn a distinction between misfeasance (action) and nonfeasance (inaction)," holding that a "tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz*, 470 Mich. at 465-66. The court noted the "misfeasance/nonfeasance distinction is often largely semantic and somewhat artificial," explaining:

> The division thus made, between misfeasance, which may support an action either in tort or on the contract, and the nonfeasance of a contractual obligation, giving rise only to an action on the contract, is admittedly difficult to make in borderland cases. There are, it is recognized, cases in which an incident of nonfeasance occurs in the course of an undertaking assumed. Thus a surgeon fails to sterilize his instruments, an engineer fails to shut off steam, a builder fails to fill in a ditch in a public way. These are all, it is true, failures to act, each disastrous detail, in itself, a "mere" nonfeasance. But the significant similarity relates not to the

---

[2]In their brief, Plaintiffs concede that this is not a case involving a special relationship and that this is not a failure to aid or assist case.

> slippery distinction between action and nonaction but to the fundamental concept of "duty"; *in each a situation of peril has been created,* with respect to which a tort action would lie without having recourse to the contract itself. [Citations omitted.]

*Id.* (emphasis added). Accordingly, the court rejected that traditional distinction and concluded that "courts should analyze tort actions based on a contract and brought by a plaintiff who is not a party to that contract by using a 'separate and distinct' mode of analysis. Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. If no independent duty exists, no tort action based on a contract will lie." *Id*.

Applying that analysis to the facts at hand, the court concluded the contractor owed no duty to the plaintiff who fell. The court explained that the plaintiff claimed the contractor breached its duty to the owner of the parking lot by failing to perform its contractual duty of plowing or salting the parking lot but alleged "no duty to her independent of the contract." *Id.* at 468. The lower court's analysis was flawed because the contractors "failure to carry out of snow-removal duties" owed to the lot owner "created no new hazard to plaintiff." *Id.* at 469.

In arriving at its holding, the court distinguished the facts before it from an earlier case, *Osman v. Summer Green Lawn Care, Inc*., 209 Mich.App. 703 (1995). That case also involved a slip-and-fall negligence claim against a snow-removal contractor. In that case, however, the contractor "had breached a duty separate and distinct from its contractual duty when it created a *new* hazard" by the way it piled the snow on the premises. *Id*. (emphasis in original).

Thus, the Michigan Supreme Court "stated in *Fultz*, [that] one breaches a duty that is 'separate and distinct' from the contract when it creates a 'new hazard.'" *Hill,* 492 Mich. at 671. "Per *Fultz*, the failure to perform" work under a contract "does not create a new hazard, it merely

13

leaves alone existing hazards or allows contemplated hazards to manifest themselves." *Davis v. Venture one Const.*, 568 F.3d 570, 573 (6th Cir. 2009).[3]

In *Loweke*, the Michigan Supreme Court again considered the issue of "when a duty of care arises between a party to a contract and a noncontracting third party." *Loweke*, 489 Mich. at 162. The plaintiff in *Loweke* was an employee of an electrical subcontactor who was working on a construction project. The defendant was a carpentry subcontractor working on that same project. The plaintiff was injured when several sheets of cement board, that the defendant had leaned against a wall, fell on the plaintiff and injured him. The plaintiff "sued defendant, alleging that defendant was negligent in stacking the cement boards in an unstable position, *creating a new hazard that previously did not exist*." *Id*. at 161 (emphasis added). Relying on *Fultz,* the trial court granted summary judgment in favor of the defendant, concluding the plaintiff's tort claim was not separate and distinct from the defendant's contractual obligations.

The Michigan Supreme Court reversed. The court stated that *Fultz*'s separate and distinct analysis "had been misconstrued to, in essence, establish a form of tort immunity that bars negligence claims raised by a noncontracting third party." *Id*. at 168. The court clarified *Fultz's* "separate and distinct" mode of analysis and held "that a contracting party's assumption of contractual obligations does not extinguish or limit separately existing common-law or statutory tort duties owed to noncontracting third parties in the performance of the contract." *Loweke*, 489 Mich. at 159. The court stated that "*Fultz*'*s* directive is to determine whether a defendant owes a noncontracting, third-party plaintiff a legal duty apart from the defendant's

---

[3]*Davis* was cited with approval in the Michigan Supreme Court's subsequent decision in *Loweke*. *Loweke*, 489 Mich. at 159.

14

contractual obligations to another" and explained that a separate and distinct duty to support a cause of action in tort can arise from various tort principles, including a special relationship[4] between the parties or "the generally recognized common-law duty to use due care in undertakings." *Id*. at 169.

In *Loweke*, as in this case, the plaintiff asserted that the defendant contractor had a common-law duty, separate and distinct from its contractual obligations, to use ordinary care in order to avoid physical harm to persons and property in the execution of its undertakings. In reversing the trial court's grant of summary judgment, the court noted that, unlike *Fultz*, the plaintiff's cause of action was "not brought solely on the basis of defendant's failure to perform its contractual obligations to the general contractor." *Id*. at 171-72. "Instead, plaintiff claims that defendant breached the common-law duty to exercise reasonable care and avoid harm when one acts.*" Id.*

Here, BMI had a contract with AK Steel under which it was to tear out the face brick of the degasser vessel in question. Construing the evidence in the light most favorable to Plaintiffs, AK Steel instructed the BMI crew to leave the alloy chute in place, tear out the brick face, and tear out the hot face of the alloy chute. BMI completed the tear out 21 days before the incident with Filippo occurred. Given how these vessels work, it is undisputed that no metal was melted in between the time that BMI tore the face brick out and when AK Steel's own staff (which included Filippo) was relining the brick interior, which could have created any slag. Thus, any slag that fell on Filippo was already on the interior of the vessel on the day that BMI performed

---

[4]Such special relationships include "common carriers and their passengers, innkeepers and their guests, and doctors and patients." *Hill,* 492 Mich. at 666. Here, Plaintiffs have not alleged that a duty existed by virtue of any special relationship.

its work. Plaintiffs claim that BMI was negligent in *failing to remove* slag that was already on the walls of the vessel. (*See* Pls.' Br. at ii, 9, 11 & 12) (claiming BMI failed to remove a piece of slag).

Plaintiffs have not produced any evidence that could establish that BMI *created a situation of peril* in the vessel that did not exist prior to its contractual work. Like the situation in *Fultz* where the plaintiff claimed the contractor failed to remove snow, Plaintiffs claim that BMI failed to remove existing slag from the interior walls of the vessel. Under Plaintiffs' own theory of the case, any slag that fell on Filippo existed prior to BMI's work and it existed after its work was done. "Per *Fultz*, the failure to perform" work under a contract "does not create a new hazard, it merely leaves alone existing hazards or allows contemplated hazards to manifest themselves." *Davis v. Venture one Const.*, 568 F.3d 570, 573 (6th Cir. 2009); *see also Hill*, 492 Mich. at 671 (explaining that the delivery and installation of a dryer in a home that already had an uncapped gas line did not create a new dangerous condition because "the hazard – the uncapped gas line – was present when defendant installers entered the premises, and it was present when they left.").

This case is easily distinguished from *Loewke* and *Osman*. In *Loweke*, the plaintiff did not simply allege that the contractor failed to perform work it was contractually obligated to perform. Rather, the plaintiff alleged that while performing its work at the job site, the defendant contractor created a situation of peril by leaning sheets of cement board against a wall, that then fell on the plaintiff. Thus, the plaintiff claimed that the defendant contractor created a situation of peril that did not previously exist. Likewise, in *Osman,* the defendant contractor did not simply fail to remove snow or salt the parking lot. Rather, while performing under the

16

contract the defendant contractor created a new hazard by the way it piled the snow on the premises. In order to fall on the *Loweke/Osman* side of the line, Plaintiff would have to establish that BMI created some situation of peril that did not previously exist inside the vessel. For example, BMI could have created a new situation of peril if it had removed an amount of slag from the walls and then left it piled up on scaffolding at the premises, which could then fall on others. But there are no such allegations, and no such evidence, in this case. The only claim here is that BMI failed to remove slag that already existed on the walls of the vessel before BMI performed its contractual work.

The facts of this case clearly fall on the *Fultz* side of the line. BMI owed no duty to Plaintiff and therefore cannot proceed with a negligence claim against BMI under Michigan law. As a result, the Court shall grant summary judgment in favor of BMI as to the negligence claim.[5]

## II. Loss Of Consortium Count

Defendant's only challenge to Anna Leone's loss of consortium claim is that there is no liability to the underlying negligence claim and, therefore, this claim fails too. Plaintiffs agree that the "loss of consortium claim stated by Anna Leone is a derivative claim that rises and falls with Mr. Leone's claim." (D.E. No. 33 at Pg ID 372). Accordingly, given the Court's ruling that summary judgment should be granted in favor of BMI as to the negligence claim, then the Court shall also grant summary judgment in favor of BMI as to this claim.

---

[5]Given that ruling, the Court need not consider BMI's additional/alternative arguments: 1) that assuming arguendo there was a duty owed to Plaintiff, Plaintiff cannot establish that BMI breached such a duty, in light of the evidence here (eg., Jackson's testimony that he inspected the vessel for slag and would have removed any slag he saw and Bogg's inspection and acceptance of the work); and 2) that Plaintiff cannot establish proximate cause.

## CONCLUSION

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

                                            s/Sean F. Cox  
                                            Sean F. Cox  
                                            United States District Judge

Dated: May 23, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 23, 2017, by electronic and/or ordinary mail.

                                            s/Jennifer McCoy  
                                            Case Manager