UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Filippo Leone, *et al.*,

    Plaintiffs,

v.                                                Case No. 15-11542

BMI Refractory Services, Incorporated,      Sean F. Cox
                                                       United States District Court Judge

    Defendant.
_____/

**OPINION & ORDER
DENYING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

After he was injured on the job at his employer, A.K. Steel, Plaintiff Filippo Leone and his wife Anna Leone filed this action asserting negligence and loss of consortium claims against a contractor (BMI Refractory Services, Inc.) whose negligence allegedly caused his accident. Following the close of discovery, BMI filed a Motion for Summary Judgment arguing, among other things, that BMI owed no duty of care to Leone under Michigan law because, in undertaking its contractual obligations to A.K. Steel, it had neither created a new hazard nor worsened any existing hazard. This Court granted summary judgment in favor of BMI on that issue, and did not address BMI's other arguments.

Plaintiffs appealed. The Sixth Circuit concluded that this Court interpreted Michigan law too narrowly on this issue and reversed. The Sixth Circuit concluded that, viewing the facts in a light most favorable to Plaintiffs, Michigan law would recognize that BMI owed Leone a duty separate and distinct from its contractual obligations to A.K. Steel. The Sixth Circuit noted that BMI had asserted there were other potential problems with Plaintiffs' case, but because BMI did

1

not adequately include arguments on those alternative grounds, the Sixth Circuit did not address them.

Following remand, Defense Counsel requested that BMI be allowed to file a renewed summary judgment motion, in order to renew the alternative arguments that this Court had not ruled upon. That motion has since been filed and briefed, and the Court heard oral argument on November 29, 2018.

In "Defendant's Renewed Motion for Summary Judgment," BMI renews grounds raised previously but not decided by this Court (whether Filippo Leone can establish breach and proximate cause and whether Anna Leone's derivative loss of consortium claim fails). It also includes an entirely new argument regarding comparative negligence. For the reasons set forth below, the Court shall DENY the motion and Plaintiffs' claims shall proceed to a jury trial.

## BACKGROUND

Plaintiffs Filippo Leone (hereinafter "Leone") and his wife Anna (collectively "Plaintiffs") filed this action against Defendant BMI based upon diversity jurisdiction. Their complaint includes two claims, both brought under Michigan law: 1) a negligence claim; and 2) a claim for loss of consortium.

Following the close of discovery, BMI filed a Motion for Summary Judgment arguing, among other things, that BMI had no duty of care to Leone because, in undertaking it contractual obligation to A.K. Steel, it had neither created a new hazard nor worsened any existing hazard. That motion did not include any arguments regarding comparative fault. This Court ultimately granted summary judgment in favor of BMI, concluding that BMI owed no duty of care to Leone under Michigan law that was separate and distinct from the contract, and did not address BMI's

other arguments.

The Sixth Circuit reversed, concluding that this Court applied Michigan law too narrowly, mistaking "a common feature of *Osman*, *Davis*, and *Loweke*[1] – the defendant's creation of a new hazard – for a requirement." *Leone v. BMI Refractory Svs., Inc.*, 893 F.3d 359, 363 (6th Cir. 2018). The Sixth Circuit appears to have concluded that a genuine issue of material fact[2] exists as to whether BMI owed a duty to Leone that was separate and distinct from its contractual obligations to A.K. Steel:

> When BMI performed on its contract – especially when it inspected the alloy

---

[1] The Sixth Circuit noted that following *Fultz*, "Michigan-law cases where courts found that a contractor owed a 'separate and distinct duty' also happened to involve contractors creating new hazards." *Leone*, 893 F.3d at 362.

[2] The issue of whether a duty exists for purposes of a negligence claim under Michigan law is usually an issue of law for the Court to determine. *See, eg.*, *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 463 (2004) ("Whether defendant CML owed a duty to plaintiff is a question of law."); *Friedman v. Dozorc*, 412 Mich. 1, 22 (1981) ("In a negligence action the question whether the defendant owes an actionable legal duty to the plaintiff is one of law which the court decided after assessing the competing policy consideration for and against recognizing the asserted duty."); *Harts v. Farmers Ins. Exch.*, 461 Mich. 1, 7 (1999) ("Whether a duty exists is a question of law that is solely for the court to decide."); *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351, 357 (6th Cir. 2014) (Citing *Fultz* and noting that, in a negligence action brought under Michigan law, the "threshold question of whether the defendant owed a duty to the plaintiff is a question of law to be decided by the court."); *Bryrum v. International Paper Co.*, 185 F. App'x 511, 514 (6th Cir. 2006). Other authority, however, suggests that necessary underlying facts relating to the issue of duty are sometimes to be determined by a jury, although the ultimate duty issue is still determined by the Court. *See, eg.*, *Aisner v. LaFayette Towers*, 129 Mich. App. 642, 645 (1983) ("Ordinarily, the element of duty in a negligence action is one of law for the court to decide. However, where there are factual circumstances which give rise to a duty, the existence or nonexistence of those facts must be decided by a jury."); *Willecke v. Kozel*, 395 F. App'x 160, (6th Cir. 2010) ("Whether a duty exists is a question of law that is solely for the court to decide. *Harts v. Farmers Ins. Exchange*, 461 Mich 1, 597 N.W.2d 47, 50 (1999). However, if 'there are factual circumstances which give rise to a duty' then '[t]he existence of those facts must be determined by a jury.' *Farwell v. Keaton*, 396 Mich. 281, 240 N.W.2d 217, 220 (1976))."

3

> chute for any loose slag – it "assumed to act." *See id.* It thereby took on "a duty . . . to perform the act in a nonnegligent manner." *See Fultz*, 683 N.W.2d at 591. *Viewing the facts in the light most favorable to the plaintiffs,* Michigan law would recognize that BMI owed Leone a duty "separate and distinct" from its contractual obligations to A.K. Steel.

*Id.* (emphasis added). The Sixth Circuit noted that BMI made additional arguments relating to breach and proximate cause, but did not address them:

> BMI notes other potential problems with the plaintiffs' case, such as Leone's concession that he has no reason to believe that the slag that hit him was loose when BMI completed its work. See Part IA., *supra*. But those issues pertain to whether BMI *breached* its duty to Leone or whether any such breach was a *proximate cause* of Leone's injury, not whether a duty existed in the first place. And because BMI proffers no alternative arguments on those grounds, we are confined to the duty question.

*Id.* (emphasis in original).

After the mandate was issued, the Court held a Status Conference with the parties and Defense Counsel requested that it be allowed to file a motion, in order to renew the alternative arguments in its summary judgment motion that this Court had not ruled upon. This Court agreed that BMI could do so. BMI filed its "Renewed Motion for Summary Judgment" on September 28, 2018.

This Court's practice guidelines, which are expressly included in the Scheduling Order issued in this case, provide, consistent with Fed. R. Civ. P. 56, provide in pertinent part that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. The Statement shall include all necessary material facts that, if undisputed, would result in summary judgment for the movant.
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in

4

> separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.
>
> d. The statements shall be non-argumentative and avoid the use of color words or distortions of the record in a party's favor. Conclusory, speculative, or conjectural statements in support of a position shall be avoided. Hearsay statements and other inadmissible evidence cannot be considered.
>
> e. Facts stated in the Statement of Material Facts Not In Dispute and Counter-Statement of Disputed Facts shall be supported with appropriate citations to the record, including but not limited to the pleadings, interrogatories, admissions, depositions, affidavits and documentary exhibits. Citations to the record must be specific, *ie.*, cite to a discrete page or portion of deposition testimony or page(s) of documentary evidence, not simply the entire deposition or document . . . .

(ECF No. 11 at Pg ID 155-56).

In compliance with this Court's practice guidelines, along with its motion, BMI filed a "Statement of Material Facts Not In Dispute" ("Def.'s Stmt.") and along with their Response Brief, Plaintiffs filed a "Counter-Statement of Material Facts" ("Pls.' Stmt.").

The following material facts are either undisputed, or are gleaned from the evidence submitted by the parties, *viewed in the light most favorable to Plaintiffs, the non-movants.*

"The events giving rise to this suit transpired inside a degasser, a large vat that [Leone's] employer, A.K. Steel, used to extract gas impurities from molten steel. Over twenty-four feet deep, with an interior diameter greater than eight feet, it was lined with layers of brick; the

5

innermost layer – called the face brick – deteriorates with use and requires occasional replacement. The degasser's components include an alloy chute near the top of the vat that allows ingredients to be added to the molten steel during processing." *Leone*, 893 F.3d. at 361. There are two cavities in the bottom called snorkels. As the parties agreed previously, "slag" is a term used to refer to the build up of scrap metal and concrete that accumulates on the interior surfaces of these vessels with repeated usage.

A.K. Steel periodically has to perform maintenance work on a given degasser, which includes two different phases. First, a tear out of the refractory brick and slag inside the degasser is done (the "Tear Out"). Second, after the Tear Out is completed, the interior of the degasser is then relined with new refractory brick ("the Rebricking").

A.K. Steel usually has its own employees perform both the Tear Out and Rebricking phases in its degassers. (Def.'s & Pls.' Stmts. at ¶ 6). But when A.K. Steel is short on manpower, it hires BMI to perform such work. AK Steel Refractory Supervisor James Boggs would hire BMI for that work. (Boggs Dep. at 10).

BMI regularly performed work at AK Steel for years, including both Tear Outs and Rebrickings of degasser vessels. (Def.'s & Pls.' Stmts. at ¶ 2).

**Tear Outs**

It is undisputed that there are no written A.K. Steel procedures or guidelines to be followed for Tear Outs. (Def.'s & Pls.' Stmts. at ¶ 3).

When a Tear Out is done, A.K. Steel would decide whether to remove the face brick only, leaving the alloy chute, or whether to remove the face brick and replace the alloy chute. (Boggs Dep. at 12-13). Boggs testified that "[t]he construction of the alloy chute is a multi-

component thing. There is a face brick aspect of the alloy chute that is removed" even when the chute is left in place. (Boggs Dep. at 14).

During all Tear Outs, the floor of the degasser is also torn out and replaced. (Boggs Dep. at 13).

During his deposition, Jackson described the general process of how the interior of a degasser is typically inspected by BMI, both visually and manually, before the BMI crew begins the tearing out of the bricks. After setting up lights to illuminate the interior of the degasser, it is visually inspected. (Jackson Dep. at 14). "Once everything is lit and ready, we go in there and check, go from top to bottom, to check to make sure there's nothing loose overhead and make sure nothing's going to fall on us." (*Id*.). Jackson testified that when they do see loose pieces, they knock them off so they fall to the bottom of the degasser. (*Id*. at 22).

Jackson then described the manner in which the BMI crew would then physically examine the interior of the degasser to remove any loose or unstable slag:

> Q. Okay. And then the next thing is you check it top to bottom, what do you do when you're checking it top to bottom?
> A. You're checking to make sure there's no loose brick, no loose slag, to make sure there's nothing loose that could fall on you.
> Q. Take me through mechanically the actual physical process of doing that, what are you doing?
> A. You get close to the brick, you can grab it or you poke it with a bar or something.
> Q. You use – how do you get in there, you use a ladder?
> A. Yes, you have to use a ladder to get in.
> Q. So does one person do it, does the whole crew do it?
> A. *One person* goes in and checks it and makes sure everything is good.

(Jackson Dep. at 14-15) (emphasis added).

BMI superintendent Gary Sund also testified that, during a Tear Out, the BMI crew goes in and physically inspects the interior of the degasser, going from top to bottom, and using a pry

7

bar or other tools to poke and prod anything on the surface. (Sund Dep. at 35-37). Sund testified that includes checking to make sure whether anything could fall from the alloy chute. (*Id*. at 37).

Jackson testified that when a crew goes in to do a Tear Out, the interior of the degasser is still warm to the touch and, as the degasser later cools down to room temperature, any materials inside the degasser tend to "shrink" and "crack." (Jackson Dep. 29-31). Jackson further testified that "[a]ny vibration, anything can loosen up material easy, especially when it cools down." (*Id*. at 41-42).

**Rebrickings**

There are no written A.K. Steel procedures or guidelines for the Rebricking phase. (Boggs Dep. at 12). During his deposition, Leone described the general process for how the Rebricking phase works:

> Q. How is that relining performed from the very beginning until the end? Describe for me what that process entails.
> A. Process is BMI tear it all out, clean it all up for us. Then BMI people let my supervisor know the degasser is ready to be relined. And after that –
> Q. That would be Mr. Boggs?
> A. – Mr. Boggs. After that, Mr. Boggs call the maintenance people, which is other welder.
> Q. Calls maintenance people the welders?
> A. Yes.
> Q. For what?
> A. They weld up to the bottom, snorkel, call it a snorkel. So we can – without those snorkels, we cannot start laying brick.
> Q. What's a "Snorkel"?
> . . . .
> A. No, just the floor. I'm talking about the floor.
> . . . .
> Q. So then after the tear-out of the brick on the sides and the floor of degasser is done, Boggs gets a hold of maintenance and the welders and they come in and cut off the snorkels and reweld new snorkels on?
> A. Yes, sir.
> Q. That's to the bottom?
> A. Yes.

> Q. How long does that take?
> A. Depends on the manpower they got. Sometimes it takes three, four days, sometime a week.
> . . . .
> Q. All right. So the bricks are torn out, the snorkels are cut off and rewelded onto the bottom of the degasser vessel. Then what's next in the process?
> A. Next – that's when we come in.
> Q. That's when you, the bricklayers, come in?
> A. Bricklayer come in, yes, and we start br[icking] snorkel.

(Leone Dep. at 110 to 116).

Leone further testified that, during the Rebricking phase, no one performs another inspection of the interior of the vessel for slag:

> Q. Okay. Does anybody go from the floor of the degasser, or the bottom of the degasser, up to the top, up that ladder or in any other fashion to make sure there's nothing loose or anything that may fall onto you or your crew working below?
> A. No.
> Q. Nobody does that?
> A. No.

(Leone Dep. at 127-28).

Thus, unlike the Tear Out phase, where the person inspecting for slag manually grabs the slag or pokes it with a bar,[3] the persons performing the Rebricking of a degasser do not perform a physical inspection of the interior for slag that may be loose or unstable.

The bricklayers lay the brick from the bottom of the vessel and work upwards toward the top of the degasser.

**The Incident At Issue**

On or about September 16, 2014, BMI had a four-man crew that conducted the Tear Out of the degasser vessel at issue in this case, pursuant to Purchase Order 5675233. That crew

---

[3](Jackson Dep. at 14-15).

consisted of Harold Jackson, Dustin Sinclair, Chris Martin, and Oscar Lopez. (Def.'s & Pls.' Stmts. at ¶¶ 2-3; Def.'s Ex. 6). That crew conducted the Tear Out pursuant to the verbal instructions of A.K. Steel Refractory Supervisor James Boggs. (Def.'s & Pls.' Stmts. at ¶ 3).

There is some dispute as to what the BMI crew was told to do pertaining to the alloy chute for this Tear Out job. Construing the evidence in the light most favorable to Plaintiffs, Boggs instructed the BMI crew not to conduct a complete tear out of the alloy chute but testified that "there is a face brick aspect of the alloy chute that is removed" and the BMI crew was "instructed to tear out the hot face of the alloy chute. (Boggs Dep. at 14 & 21-22).[4]

It is undisputed that the Tear Out of the vessel was conducted from top to bottom. (Def.'s & Pls.' Stmts. 4).

The work performed by BMI was performed on a single day, September 16, 2014. Lopez was acting as the confined space attendant on this job. (Jackson Dep. at 10). Jackson and Martin went into the degasser and did the actual Tear Out work. (*Id.*).

Jackson testified that, for this Tear Out, the alloy chute was not to be touched "unless something [was] loose." (Jackson Dep. at 18). Jackson testified as follows regarding the alloy chute:

> Q. Okay. Did you take a look at the alloy chute on your way down?
> A. Yes.
> Q. Anything in the alloy chute?
> A. It didn't look like it, no.
> Q. Okay. You didn't see anything?
> A. No.

---

[4]Another AK Steel supervisor named Shawn Halley testified that when a tear out is performed without removing the alloy chute, the alloy chute is to be cut back so that it is flush with the face brick. (Halley Dep. at 29).

| | | |
|---|---|---|
| Q. | If you had seen something, would you have knocked it off? | |
| A. | Yes. | |

. . . .

| | | |
|---|---|---|
| Q. | When you go through and check for loose material, do you check the face of the alloy chute? | |
| A. | Yes. | |
| Q. | And would you – would you have checked it for something like that sticking out? | |
| A. | Yes. | |
| Q. | If that were sticking out or loose on the face of that alloy chute, would you have checked it? | |
| A. | Yes. | |
| Q. | And then removed it, if it were loose? | |
| A. | Yes. | |

(Jackson Dep. at 22 & 29).

Jackson testified that, as to this Tear Out, he personally performed both the visual and physical inspection of the interior of the degasser for slag by himself. (Jackson Dep. at 15-17).

But, as Plaintiffs note, that testimony is contradicted by the confined space sign-in sheet (Pls.' Ex. 3), which does not show an initial entry by Jackson alone. It shows the first entry was by Jackson and Martin together.

Martin testified that when looking for things that may fall, "you eyeball it, you know, sweep any dust that might fall on you when you're down there" and "usually it's got a crust on it, so you know it's pretty safe.' (Martin Dep. at 9-10).

Boggs testified that he inspected and signed off on this Tear Out job by BMI. (Boggs Dep. at 19). Boggs testified that sometimes he would go into a degasser to inspect it, and other times he would just look down into the degasser from the top. Boggs does not remember if he went into the degasser following BMI's work on this particular Tear Out job. (Boggs Dep. at 92-93).

Leone, a veteran mason his entire adult life, had been working with AK Steel or its

11

predecessor since 1997 and was also a working leader from 2010 up through the day of this accident. (Def.'s & Pls.' Stmts. at ¶ 6).

Leone was supervised by Boggs. Leone had been working in this same degasser every month and a half for 18 years. Leone had previously performed both Tear Outs and Rebrickings. Def.'s & Pls.' Stmts. at ¶ 6).

On October 7, 2014, 21 days after BMI completed its Tear Out, Leone and another employee were performing the Rebricking of the degasser and had been doing so for about one week. About a week prior to that, the snorkels were torched off and replaced with new snorkels on the bottom of the degasser vessel. (Def.'s & Pls.' Stmts. at ¶ 7).

During the Rebricking, Leone climbed up and down the ladder, which he or his crew placed inside the degasser, at least five times per day. (Def.'s & Pls.' Stmts. at ¶ 8). The alloy chute in this degasser is within six feet of Leone or any other individual going up and down the ladder.

Photographs of the degasser show that there was some slag visibly present on the alloy chute. (*See* Def.'s Exs. 9 & 10).

At no time did Leone see any loose slag associated with the alloy chute or its face, or anything Leone thought was a danger or concern. (Def.'s & Pls.' Stmts. at ¶ 8). If Leone had seen such or had his crew reported such, Leone would have stopped this job and remedied the condition. (*Id.*).

Viewing the evidence in the light most favorable to Plaintiffs, Leone did not perform any kind of physical inspection of the slag during the Rebricking. (Leone Dep. at 127-28). That is, after BMI completed its Tear Out work, Leone did not conduct another inspection to determine if

12

any slag present was loose or unstable.

Leone was working on a scaffold in the bottom of the degasser on October 7, 2014, when a piece of "slag' fell down and struck his lower back/buttocks. (Def.'s & Pls.' Stmts. at ¶ 13).

Dewain Anthony Love, who was working inside the degasser with Leone at the time of the incident, testified that from his peripheral vision he saw the slag fall and "yelled whoa" but "it hit [Leone] before he could even react." (Love Dep. at 25-29). Love identified the slag as having come off the alloy chute. (*Id.*).

That piece of slag was weighed and photographed. (Pls.' Ex. 6). It weighed 40 pounds. Boggs testified that he kept that piece of slag in the back of his truck for a few months but then he threw it out. (Boggs Dep. at 51).

Both Leone and Boggs testified that they do not know how or why the piece of slag became dislodged or when it became loose. (Boggs Dep. at 67; Leone Dep. at 174).

Boggs testified that the size and shape of the piece of slag "indicated it came off the alloy chute." (Boggs Dep. at 46).

The parties agree that there are many possible reasons why the piece of slag became dislodged, including, but not limited to, vibration from equipment and temperature changes inside the degasser. (Def.'s & Pls.' Stmts. at 10).

**ANALYSIS**

Because this action is in federal court based upon diversity jurisdiction, Michigan law governs Plaintiffs' negligence and loss of consortium claims. The pending motion challenges

13

both claims.

I.  **Renewed Challenges To Negligence Claim**

In Michigan, a prima facie negligence claim requires a plaintiff to show that: 1) the defendant owed the plaintiff a legal duty; 2) the defendant breached the legal duty; 3) the plaintiff suffered damages; and 4) the defendant's breach was a proximate cause of the plaintiff's damages. *Leone*, 893 F.3d at 362.

In the pending motion, BMI asserts that Plaintiffs cannot establish that it breached its duty of care and also cannot establish proximate cause.

   A.  **Can Leone Create An Issue Of Fact As To Whether BMI Breached Its Duty Of Care?**

In concluding that, when the facts are viewed in a light most favorable to Leone, BMI owed Leone a duty under Michigan law, such that he could proceed with a negligence claim, the Sixth Circuit stated: "When BMI performed on its contract – especially when it inspected the alloy chute for any loose slag – it 'assumed to act'" thereby taking on a duty to perform the act in a non-negligent matter. *Leone*, 893 F.3d at 363.

Once the existence of such a duty is established, the general standard imposed on a defendant is the exercise of due care or to act as a reasonable person would under like circumstances. *Case v. Consumers Power Co.*, 463 Mich. 1 (2000).

Here, Leone asserts that the "evidence that has been presented in this case demonstrates that BMI breached this duty by allowing a 40 pound piece of slag to strike Mr. Leone." (Pls.' Br. at 7-8).

In support of that position, Leone first notes that it is undisputed that the slag that struck him was waste material from ordinary plant operations – and it had to have existed before and

after BMI performed its work. *See Leone*, 893 F.3d at 361 ("Because no molten metal could have created new slag between the end of BMI's tearout and the accident, the district court concluded (and the parties do not contest) that the offending slag must have existed when BMI's employees finished.").

Leone asserts that the "breach of duty is that BMI never did the inspection that they claimed to do and, as a result, they never found the slag that ultimately fell" on him. (*Id*.)

In support of that position, Leone notes that "Jackson was insistent that one worker – him – examined the entire vessel for loose debris from top to bottom before the platforms are put in and the two workers enter to begin the tearout, (Jackson pp. 14-17, Ex. 9) yet the confined space entry log clearly reflects Jackson and Martin entering at the same time and remaining in the vessel for over three hours." (Pls.' Br. at 8). Leone notes that the "inspection Jackson described is conspicuously absent" from the confined space entries for the day in question. He further directs the Court to Martin's testimony about how "you eyeball it" and how the vessel "usually it's got a crust on it, so you know it's pretty safe." (Martin Dep. at 9-10).

Leone also directs the Court to evidence that the slag that hit Leone came from somewhere on the face of the alloy chute and evidence that "[t]emperature changes, vibration, hammering, and other normal work conditions can cause slag to fall, which was known" to BMI. (*See* Jackson Dep. at 29-31 & 41-42).

In sum, Leone argues that, construing the evidence in the light most favorable to him, a reasonable jury could conclude that "BMI failed to do the inspection it claimed to do and left this vessel with an unstable forty pound piece of slag poorly adhered to the face of the alloy chute" and that they "did so knowing that vibration, temperature change, and other entirely foreseeable

15

forces could cause pieces of slag [,] just like the one that ultimately injured Mr. Leone, to fall." (Pls.' Br. at 10).

This Court agrees that, viewing all of the evidence in the light most favorable to Leone, a reasonable jury could find that BMI breached its duty by failing to inspect for, and remove, slag from the degasser.

### B. Can Leone Create An Issue Of Fact As To Proximate Cause?

BMI's motion also asserts that Leone cannot create a genuine issue of material fact as to proximate cause.

"In order to establish causation, a plaintiff must prove two elements: (1) cause in fact and (2) proximate cause." *Rupert v. Daggett*, 695 F.3d 417, 425 (6th Cir. 2012) (citing *Skinner v. Square D Co.*, 445 Mich. 153 (1994)). The cause in fact element generally requires showing that "but for" the defendant's actions, the plaintiff's injury would not have occurred. *Id.* The Michigan Supreme Court "clarified the governing standard for proximate cause" as follows:

> Proximate causation involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for such consequences given his negligent acts or omissions. This Court has defined proximate cause as "a foreseeable, natural, and probable cause." Such causation is distinct from factual or "but for" causation, and issues of proximate causation thus call for an independent, searching inquiry, the focus of which is whether the result of conduct that created a risk of harm and any intervening causes were foreseeable. Probability of harm is thus a relevant consideration to determine whether the defendant's conduct was foreseeable or if the defendant should be held legally liable in light of the circumstances. Since there are risks that can be foreseen but would not be avoided by a reasonable person, for liability to attach the harm must be of a kind that defendant should have avoided or it must be shown that defendant's actions presented an unreasonable risk of harm.

*Rupert,* 695 F.3d at 425-26 (quoting *Jones v. Detroit Med. Ctr.*, 490 Mich. 960 (2011)). As the Sixth Circuit further explained:

16

> If an intervening force is not reasonably foreseeable under an objective standard, it constitutes a "superseding cause" which relieves a prior negligent defendant from liability. *Ridley v. City of Detroit,* 231 Mich.App. 381, 590 N.W.2d 69, 73 (1998), *remanded on other grounds sub nom. Ridley v. Collins,* 463 Mich. 932, 622 N.W.2d 65 (2000). "While an act of God or the gross negligence or intentional misconduct by the victim or a third party will generally be considered a superseding cause, *ordinary* negligence by the victim or a third party will not be regarded as a superseding cause because ordinary negligence is reasonably foreseeable." *People v. Schaefer,* 473 Mich. 418, 703 N.W.2d 774, 786 (2005); *see also Love v. City of Detroit,* 270 Mich.App. 563, 716 N.W.2d 604, 610 (2006) (Cooper, J., dissenting) (applying *Schaefer* to civil case). An intervening cause is considered reasonably foreseeable when the defendant's negligence "enhanc[es] the likelihood that the intervening cause will occur." *Hickey v. Zezulka,* 439 Mich. 408, 487 N.W.2d 106, 119 (1992). "[W]hether an intervening negligent act of a third person constitutes a superseding proximate cause is a question for the jury." *Ykimoff v. Foote Mem. Hosp.,* 285 Mich.App. 80, 776 N.W.2d 114, 133 (2009) (quoting *Taylor v. Wyeth Lab., Inc.,* 139 Mich.App. 389, 362 N.W.2d 293, 300 (1984)). Lastly, there may be more than one proximate cause contributing to an injury. *Lewis v. Yale Co.,* 888 F.2d 1391 (Table), 1989 WL 136144, at *2 (6th Cir. Nov. 13, 1989).

*Id.*

Here, BMI first asserts that Leone cannot establish proximate cause because: 1) there is no witness who can testify as to when the piece of slag that fell on Leone became loose; 2) it was unforeseeable that the piece of slag would fall and injure Leone 21 days after it finished the Tear Out, during the Rebricking of the degasser; and 3) there could have been some other intervening and superceding cause of this accident, such as other people having worked on the degasser, such as when the snorkels were replaced.

Notably, the issue of proximate cause is typically a question of fact for the jury. *See Helmus v. Dep't of Transp.*, 238 Mich. App. 250, 256 (1999). The Court concludes that Leone has presented evidence that, if believed by the jury, is sufficient to create an issue of fact as to proximate cause in this action.

As Plaintiffs' brief notes, Leone does not need to present a witness who can testify as to

17

precisely when the piece of slag became loose or dislodged, as circumstantial evidence is permissible.

"The plaintiff in a Michigan negligence action need only provide proof of 'a reasonable likelihood of probability' that his explanation of the injury is correct." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) (citing *Skinner, supra*).

Leone's theory of causation is as follows. BMI was an experienced contractor who had previously been hired for both Tear Outs and Rebrickings in degassers at A.K. Steel. As to this job, BMI was hired to do the Tear Out phase, and knew that a Rebricking would follow under the normal course of this cyclical work. BMI had a duty to remove slag that was loose or could become dislodged, thereby endangering workers inside the degasser during both the Tear Out and Rebricking phases. BMI's crew knew that they had to manually touch or pry potentially unstable slag, rather than simply looking at the walls. BMI's crew also knew that temperature changes and vibrational forces could cause slag to fall, and that such temperatures changes and vibrational forces would occur after its work was finished, during the Rebricking of the degasser. Yet BMI's crew failed to remove a visible, forty-pound, piece of slag from the alloy chute, which then dislodged as result of foreseeable forces of which BMI's crew was aware, such as the snorkels being removed and replaced at the bottom of the degasser.

Under Michigan law, a jury in a negligence case is allowed to consider such a "reasonable hypothesis even when supported by circumstantial evidence." *McLean,* 224 F.3d at 805.

### C. Is Leone More Than 50% Comparatively Negligent?

Although its original motion never included this issue, BMI's Renewed Motion for

18

Summary Judgment asserts that if this Court finds any question of fact regarding any breach of duty by BMI or proximate cause, then Leone's comparative negligence must be analyzed. (Def.'s Br. at 17).

In response, Plaintiffs assert that his argument is untimely because it was not contained in BMI's original summary judgment motion and was raised for the first time in this renewed motion. (Pl.'s Br. at 17).

The Court concludes that it would not be appropriate to address this new argument, which was not raised by BMI in its original summary judgment. This Court allowed BMI to renew its previous arguments that were not addressed by the Court; it did not agree to allow it to raise additional issues that could have been, but were not, included in its original motion.[5]

## II. Challenge To Loss Of Consortium Claim

As its only challenge to Anna Leone's loss of consortium claim, BMI contends if there is no basis for liability as to the negligence claim, then this claim fails too.

"A derivative claim for loss of consortium stands or falls with the primary claims in the complaint." *Long v. Chelsea Commty. Hosp.*, 219 Mich. App. 578, 589 (1996). Plaintiffs do not dispute this concept. (Pls.' Br. at 24) ("Plaintiff agrees that the loss of consortium claim stated by Anna Leone is a derivative claim that rises and falls with Mr. Leone's claim" for

---

[5]Moreover, as BMI's own brief acknowledges, normally the question of a plaintiff's comparative negligence is a question for the trier of fact. *Poch v. Anderson*, 229 Mich. App. 40, 51 (1998); *see also Jimkoski v. Shupe,* 282 Mich. App. 1, 8 n. 3 (2016) ("The extent of a plaintiff's comparative fault, if any, is generally a question for the jury."). Only where no reasonable juror could find that the defendant was more at fault than the plaintiff should the issue be considered in a motion for summary judgment. *Huggins v. Scripter*, 469 Mich. 898, 898-99 (2003). This does not appear to be such a case.

19

negligence.).

Given that this Court is denying BMI's request for summary judgment as to the negligence count, Anna Leone's loss of consortium claim will also proceed to a jury trial.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that BMI's Renewed Motion for Summary Judgment is DENIED and Plaintiffs' claims shall proceed to a jury trial.

IT IS SO ORDERED.

                                        s/Sean F. Cox
                                        Sean F. Cox
                                        United States District Judge

Dated: December 13, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 13, 2018, by electronic and/or ordinary mail.

                                        s/Jennifer McCoy
                                        Case Manager